## Case No. 5,867.

GUM v. EQUITABLE TRUST CO. et al.

[1 McCrary, 51.][2]

Circuit Court, D. Iowa. Oct., 1873.

UNRECORDED DEED—POSSESSION—NOTICE — MISTAKE OF TRACT—ESTOPPEL—AGENCY —SALE AGENT.

1. Complainant purchased certain land from B. and took a conveyance which he neglected to place on record. B. subsequently made a mortgage to respondents upon other lands, and by

[1] [Reported by Hon. William Cranch, Chief Judge.]
[2] [Reported by Hon. Geo. W. McCrary. Circuit Judge, and here reprinted by permission.]

mistake included in said mortgage the land previously sold to complainant. The respondents claimed the land under the mortgage. Held, that they were not bona fide purchasers without notice, since the complainant was in the actual open, notorious, adverse possession of the land when the mortgage was executed. Actual possession is constructive notice to all the world.

2. B., in order to obtain a loan of $3,000 from respondents, proposed to secure them by deed of trust on his home farm. In his application for the loan and in the appraisement which accompanied the same, the land which complainant had previously purchased from B. was by mistake included with the farm. The complainant was one of the appraisers of the land and signed the writter appraisement, supposing it related to the farm only, and ignorant of the fact that his own land was included. Held, that he was not estopped.

3. A mere appraiser of land, serving gratuitously for the benefit of others, without any interest of his own involved, is not to suffer by reason of an innocent mistake respecting the description of the land. Estoppel in such a case can proceed only upon the ground of fraud or gross negligence.

4. It is not always necessary that a sale agent should be known to his principal, or in any way recognized by him, in order to bind the latter. Authority is sometimes implied from the very nature of the duties and powers committed to a general agent, to employ sale agents, and, when this is the case, the principal is bound by the acts of the sale agent whether the sale agent be known to him personally or not.

In equity.

J. C. Coad and Trimble & Carruthers, for plaintiff.

Brown & Dudley, for defendants.

LOVE, District Judge. This bill is brought to cancel a certain trust deed executed by William and Nancy Beard to said Jonathan Edwards, trustee, to secure the payment to said Edwards' co-defendant the sum of $3,000, so far as said trust deed embraces certain lands described in the bill and claimed as the property of this complainant. The evidence clearly shows that about the year 1865 William Beard, who was the father of Sarah E. Gum, the wife of this complainant, sold to said William Gum the following lands and tenements in Davis county, Iowa, viz.: The W. ½ of N. W. ¼ of section 8, and the S. W. ¼ of S. W. ¼ of section 5, in township 68, range 15; and that said William Beard about the same time gave to said Sarah E. forty acres of land adjoining the above described, as follows: The N. W. ¼ of the S. W. ¼ of section 8, same township and range. The sale to William Gum was a full and valuable consideration, which was paid by said Gum. Said William and Sarah E. Gum took possession of the land and made valuable improvements upon it. They have had the open uninterrupted and adverse occupancy of the land for about twelve years, from the year 1865 to the time of the bringing of the suit. They are illiterate and ignorant people. No conveyance was made to them of the land until the 17th day of April, 1865, when William Beard and wife executed separate deeds to them for the land in question;

that through the negligence of these grantees, their deeds were not filed for record till August 26, 1876. It also appears that about the month of February, 1876, William Beard made application through the Davis County Loan Company, of which the managing members were F. C. Overton and Amos Steckel, to the defendant trust company, for a loan of $3,000; that said William Beard executed a deed of trust to secure the same to said Jonathan Edwards, as trustee for the company, which said deed of trust was delivered and duly recorded on the 30th day of March, 1876; that this deed of trust included, with some of said Beard's land, the above described land, which had been previously conveyed by Beard to this complainant and his wife. It further clearly appears from the evidence, that, so far as said Beard was concerned, the said land of the complainant and his wife was included in the deed of trust by inadvertence and mistake; that Beard did not intend to mortgage the complainant's land, or any part of it, to secure said loan, but intended and agreed to execute the mortgage upon his (Beard's) own land, being in part the land on which Beard lived. It further appears clearly by a great preponderance of evidence, that when said Overton, after the loan had been agreed upon, was at Beard's house for the purpose of having the deed of trust executed, Gum, the complainant, was present; that both Gum and Beard cautioned Overton not to get the mortgage on Gum's land; that Overton called for Gum's deeds; that Gum went to his own house and returned with the two deeds from Beard to him and his wife; that he handed these two deeds to Overton: that Overton took them and compared the description, and assured Gum that his (Gum's) land was not included in the deed of trust; that neither Gum nor Beard or his wife could read or write; that the deed of trust was not read over to Beard and his wife, but that they executed and delivered the same to Overton, by whom it was taken away. Thus it appears that the property involved in this suit did not, at the time when William Beard conveyed it by way of mortgage to respondents, belong to him. It was then, in fact, as the evidence clearly and satisfactorily shows, the property of the complainant William Gum. Beard had sold it to Gum for a valuable consideration in 1865, and executed a formal conveyance on the 17th day of April, 1875. Beard, therefore, clearly had no title to the land when he conveyed it to respondents on the 29th of March, 1876. Upon what grounds, then, do the respondents claim title under Beard as against William Gum, the real owner at the time of the execution of the deed of trust or mortgage to Jonathan Edwards?

The respondents place their claim of title upon two grounds: 1st. That they are purchasers without notice for value under the complainant's grantor. 2d. That respondent is estopped by his own action as appraiser from now setting up his title as against the respondents. Both parties claim title under a common grantor, William Beard. The complainant's deed was first executed, but it was not filed for record until after the recording of the respondents' deed, when the respondents advanced their money and took Beard's mortgage to secure it. Beard was of record the apparent owner of the property. There was then no record of any conveyance from Beard to complainant. If this were all, the respondents would have a clear right to the property as against the unrecorded deed of the complainant. This is undoubtedly true, if it be found that Overton was not the respondents' agent in taking the conveyance. Overton had actual notice of the conveyance from Beard to Gum under which the latter claims—of this there can be no question upon the evidence. The proof that Gum, when Overton was at Beard's house to get the mortgage executed, exhibited his deed to Overton, leaves no doubt whatever that Overton had actual notice of Gum's deed. But respondents insist that Overton was not their agent, and they offer testimony to show that they had no agent in Iowa to effect loans for them. It would seem, if we are to credit their witnesses, that none of the middle men were acting for the respondents, or for their interest. These middle men were not the principals in the transaction. They were agents for some one, and if the testimony of respondents' witnesses be correct, they were acting as agents for Beard.

And from this, the conclusions follow that the respondent, a monied corporation, was engaged in the business of lending money in this distant state, not upon information furnished by their own agents, but upon information supplied to them by the agents of the borrowers. In other words, the borrowers' agents made abstracts of title, examined and valued the land, and gave information of the character and responsibility of the borrowers, and upon the information so furnished the corporation based their loans! It must be admitted that this is somewhat extraordinary, if true. But if it be conceded, then it follows that the respondents had no actual notice of Gum's prior deed; but had defendants not constructive notice of the existence of that conveyance? The complainant was at the time of the execution of the mortgage in the actual open and notorious adverse possession of the land; he had occupied the land for a period of eleven or twelve years. Now, under the settled law of Iowa, this possession of the complainants was equivalent to constructive notice of the recording of the deed; actual possession is constructive notice to all the world. It matters not where the grantees resided, they were affected by this constructive notice of the complainant's title, the same as if the deed had been recorded. If complainant's deed had been recorded, it will not be claimed that respondents, wherever they resided, could have ob-

tained a title from Beard, so as to have postponed the complainant. The same rule applies in case of constructive notice resulting from the actual adverse possession of the complainants. Putting, therefore, entirely out of view the matter of actual notice to Overton or any other agent of the respondents, their claim of title as innocent purchasers for value without notice cannot be sustained. The respondents' principal reliance, however, would seem to be upon the ground of estoppel. Let us consider the facts upon which that defense rests. William Beard, in order to obtain a loan of $3,000 from the respondents, proposed to secure them by a deed of trust upon his home farm, or so much of it as might be required for that purpose. It is perfectly clear from the evidence that he had no purpose whatever to mortgage the complainant's land; but in the written and printed application which it became necessary for him to make in order to comply with the rules of the defendant company, he by mistake included the land involved in this suit, which he had previously conveyed to William Gum and Sarah E. Gum, his wife. Beard's application for the loan was made through F. C. Overton and Amos Steckel, loan agents in Bloomfield; the application was made by Beard upon a printed blank, filled up by the loan agents and signed by Beard, or by some one for him. It was necessary to have the land valued by two appraisers, which was evidenced by their signatures upon another page of the same printed blank. It appears that Beard had signed the application, and that one Luther Hunt had subscribed the appraisement, and that afterwards William Gum, at the request of Beard, went to the office of Overton and Steckel to give his appraisement of the land.

It is perfectly clear from the evidence that Gum supposed and believed that he was to appraise Beard's homestead land. Beard told him what land he was to appraise, and pointed it out to him. Gum clearly had no thought that his own land or any part of it was to be included in the appraisement, but only the land of Beard, which the latter had shown him. Gum, with this understanding, went at Beard's request to Overton and Steckel's office to make the appraisement. Upon the face of the appraisement it appears that Gum signed it and swore to it, but Gum swears that neither the application nor appraisement was read to him, and that no oath was administered. He was an ignorant man, and could neither read nor write. There is very good reason to believe Gum's statement as to what happened at the loan agent's office when he went to appraise the land. But let us assume that the appraisement was signed by Gum, as it appears to be, and that both the application and appraisement were read over to him.

The application contained, as I have said, a description of the land by numbers, with a plat of the same. The description by num-

bers erroneously and by mistake included Gum's land, but the plat showed that Beard's land, and not Gum's, was the land intended to be appraised and mortgaged. Beard in the application makes the following answers: "11. By whom are the premises occupied? Ans. By applicant." "14. In whom is the title vested? Ans. Applicant." The appraisers appear upon the face of the paper, after giving their valuation of the land, to affirm (the same being in printed form) as follows: "We also state that the condition of the property is truly set forth in the applicant's statement in said application, and that his answers to the questions contained therein are true, as we verily believe." This is what constitutes the estoppel asserted by the respondents. They insist that the appraisement is an essential part of the application, and that they took the loan on the faith of it, believing what the appraisers affirmed under oath to be true, and that they would not have parted with their money but for their belief in the truth of the statement contained in the appraisement. How far the lenders of money rely upon the statements of appraisers respecting the borrower's title to land, is certainly very questionable. Appraisers are generally understood to be freeholders of the neighborhood, called to place a value upon the land. They are not supposed to be acquainted with land titles. Anything they are made to answer in an indirect way to printed questions as to their belief in the truth of what the borrower affirms respecting his title, would, we should think, have very little weight with the lender in determining the matter of title. The lender must surely rest his determination as to the title upon more certain, direct and reliable information than the answers which he thus obtains from persons called upon to make a gratuitous valuation of the land. What the appraiser may affirm in regard to the title must be regarded, I think, as a mere make-weight by the lender in making up his judgment. But, however this may be, it is perfectly clear upon the evidence in this case, that William Gum, if the application was read to him, and if he did affirm that Beard occupied and owned the land described by numbers in that application, was laboring under a mistake of fact. Gum believed that he was speaking with reference to the land which Beard had pointed out to him, and which he came to appraise. The mistake was perfectly innocent on his part. He was a volunteer, acting at the request of, and for the accommodation of other parties; his services were gratuitous; he had no interest whatever in the transaction. Now it would certainly strike any one as a severe measure of justice if a mere appraiser of land, serving gratuitously for the benefit of others, without any interest whatever of his own involved, should lose his homestead and his farm in consequence of an innocent mistake respecting the description of the

land. If in such a case the appraiser's own land should be inadvertently described by numbers in the borrower's application. and the appraiser should innocently and without the least semblance of fraud, by mere mistake, untruly affirm that the borrower is in possession of the land, and has good title to it, is he to be visited with the heavy penalty of the loss of his farm and his homestead? Certainly nothing but fraud or gross negligence on the part of the appraiser could justify so severe a judgment against him. Indeed, estoppel must proceed upon the ground of fraud or gross negligence. These elements lie at the very foundation of the doctrine of estoppel. It is at best a severe doctrine that closes the mouth of a party and denies him the right to assert the truth respecting his title. That there was any fraud on the part of Gum in this appraisement will not be asserted. It is clear that he acted in perfect good faith.

There is no evidence to warrant the imputation of gross negligence on the part of Gum. Admitting that the application and appraisement were read to him, and that he did not, from the reading of the numbers, see that his own land was described, it does by no means follow that he can be charged with negligence. There are many careful men who do not retain in memory the numbers describing their land, and who would not, from the mere reading of the numbers, know that their own land was described. If any one doubts, this, let him make the experiment upon himself, and I think he will be convinced. Moreover, Gum came to the loan office to appraise Beard's land, which had been pointed out to him. Beard and Overton both told him the land was Beard's. They described the land in the application, and Overton, as we assume, read it to him. Had he any reason to suppose that they had inserted wrong numbers in the paper read to him, and, least of all, that they had inserted numbers describing his (Gum's) own land? What Gum came for was to value, not describe the land or verify the description. To have scrutinized the numbers, to have verified them by comparison with deeds and records, or with the plat which accompanied the application, would indeed have been acts of extraordinary care and diligence. But the failure to do these acts falls very far short of gross negligence. There is another circumstance which goes very far to relieve Gum of the imputation of gross negligence, or, indeed, of any negligence at all. There was a plat attached to the application; indeed, it was on the same sheet of paper. This plat had been made by Luther Hunt. Upon this plat the land which was to be appraised was marked out. If Gum, who could neither read nor write, is to be strictly bound by the printed and written parts of the application. by much greater reason is he entitled to the benefit of any inference justly to be drawn from the fact apparent on the face of the plat in question. Was

it not perfectly natural for Gum, an illiterate man, to look to the plat as truly showing the land to be appraised, and for that reason give less attention to the numbers as read off to him? Is there one man in a thousand, who, if called upon to appraise land, and to affirm anything respecting it, would not rely rather upon the plat of the land exhibited to him by the parties interested for a true description, than upon the numbers of the land? Now upon the plat thus exhibited to Gum, the land marked for appraisement was Beard's land, not Gum's. What the plat showed corresponded with what Gum had been informed by Beard respecting the land to be appraised.

It may doubtless be said that the respondents have been mistaken and injured by the false and negligent statements of the complainant, and that the complainant ought to be responsible for the consequences; that if one of two innocent parties must suffer, the damages should fall upon him who causes the injury, though ever so innocently, etc. But in the first place the respondents cannot fairly trace their injury to the appraisement. They must look behind it to Overton, who was really the party whose misconduct led to the whole difficulty. I am satisfied, from the evidence, that all the parties except Overton labored under an honest mistake as to the land conveyed. It would seem that even Overton labored under the same mistake until the deeds of the complainant and his wife were exhibited to him at Beard's house. Now Overton was certainly not the complainant's agent. Whether he acted as agent for Beard or for the respondents may admit of question. If I found it necessary to decide this question, I would be compelled to say that, in my opinion, the preponderance of evidence tends to establish the fact that Overton was, as to that transaction, acting for the respondents. It is not necessary that a sub-agent should be known to his principal, or in any way recognized by his principal, in order to bind the latter. The innumerable sub-agents of railroads and other corporations are entirely unknown to their principals. Authority is sometimes implied from the very nature of the duties and powers committed to a general agent to employ sub-agents, and when this is the case, the principal is bound by the acts of the sub-agent, although the latter may never be known or recognized by the principal. It would be difficult to affirm that, from the very nature of the business committed to Underwood and Clark, they did not have implied power to employ sub-agents in effecting loans for respondents.

It is not, however, necessary, in my view of this case, to determine whether or not the middle men in this case were, in fact, the agents of the respondents.

Lastly, if the respondents have received injury, they have a plain and adequate remedy. Beard is not insolvent. and he has not, it seems, conveyed the land which he intended to mortgage to respondents. The respondents

can undoubtedly file their bill to correct the mistake, and subject the land intended to be conveyed to the payment of their mortgage debt. Thus exact justice may be meted out to all parties. Decree for the complainant.